UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

TELEBRANDS CORP.,

                             Plaintiff,

               -v-

GUANGZHOU ALPACA HOME FURNISHING
CO., LTD. d/b/a XIRSSVY US; GUANGZHOU
KEDUOQING TECHNOLOGY CO., LTD. d/b/a
GOTOCHEER US; JIEYANG BAOPENG
TRADING CO., LTD. d/b/a BAOPENG-US; and
ZHIJIANG CONGJUAN TRADING CO., LTD.
d/b/a MAIBUL US,

                         Defendants.

------------------------------------------------------------------X

25-CV-3646 (JAV)

OPINION AND ORDER

JEANNETTE A. VARGAS, United States District Judge:

      Telebrands Corp., a developer, producer, marketer, and distributor of expandable garden hoses called the Pocket Hose Products, alleges that Defendants infringed its patent by allegedly making, distributing, marketing, and selling expandable garden hoses through their storefronts hosted on online marketplaces. Plaintiff seeks a preliminary injunction pursuant to Federal Rule of Civil Procedure 65. For the reasons stated below, the application is GRANTED IN PART AND DENIED IN PART.

## PROCEDURAL HISTORY

      On May 1, 2025, Plaintiff commenced this action by filing an *ex parte* application (the "Application") for a Temporary Restraining Order ("TRO") to enjoin Defendants from manufacturing and selling products that infringe its patent for a garden hose product it originated. ECF No. 32. Accompanying the Application

were declarations from Jason Drangel, a partner at the law firm of Epstein Drangel LLP, which represents Plaintiff in this action, and Peter Quilla, a Senior Paralegal for Plaintiff.    *See* ECF Nos. 33-34.

The Application sought a TRO enjoining Defendants from "(1) manufacturing, importing, exporting, advertising, marketing, promoting, distributing, displaying, making, using, offering for sale, selling and/or otherwise dealing in Infringing Products, or any other products that utilize the technology of one or more claims in the Pocket Hose Patent; (2) directly or indirectly infringing in any manner Plaintiff's Pocket Hose Patent; and (3) making, using, selling, importing and/or offering to sell products that infringe the Pocket Hose Patent."  ECF No. 31 at 5-6. The Application further sought to restrain Amazon and Defendants' financial institutions from aiding Defendants in "secreting, concealing, transferring, disposing of, withdrawing, encumbering or paying Defendants' Assets from or to Defendants' Financial Accounts until further ordered by this Court."  *Id.* at 6-7.

The Court entered the TRO on May 7, 2025, and ordered Defendants to show cause in a hearing before the Court on May 22, 2025, as to why a preliminary injunction should not issue.  ECF No. 35.  On May 22, Defendant Guangzhou Keduoqing Technology Co., Ltd. ("KDQ") requested an evidentiary hearing, contending that the essential facts of Plaintiff's allegations regarding, *inter alia*, infringement and irreparable harm are disputed.  The next day, the Court granted that request and the hearing was adjourned to May 29, 2025.  ECF No. 39. Defendant KDQ further argued that the TRO should be dissolved and that the

Court was without authority to order the freeze of assets under Rule 65. KDQ Opp'n Br. Defendant Guangzhou Alpaca Home Furnishing Co., Ltd. d/b/a Xirssvy US ("Xirssvy") joins KDQ's arguments and, to the extent the TRO is not dissolved, seeks a modification such that the assets subject to restraint are capped at the amount of profits attributable to the infringement. Xirssvy Opp'n Br. at 3-7.

During the evidentiary hearing on May 29, 2025 (the "Hearing"), counsel for Defendants KDQ, Xirssvy, and Jieyang Baopeng Trading Co., Ltd. d/b/a Baopeng-US ("Baopeng") appeared. Plaintiff introduced testimony from two witnesses: Danielle Futterman, Plaintiff's counsel in this litigation and a partner at Epstein Drangel LLP; and Bala Iyer, the Executive Vice President and Chief Operating Officer for Plaintiff. The Court also heard argument on the propriety of restraining assets under Rule 65 in a utility patent infringement action. The Court ordered the parties to submit supplemental briefing by June 2, 2025, to address the issue of whether the remedy of reasonable royalties was legal or equitable in nature.

## FINDINGS OF FACT

"On a motion for preliminary injunction, if essential facts are in dispute, there must be a hearing and appropriate findings of fact must be made." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Stucco Sys's, LLC*, 289 F. Supp. 3d 457, 463 (S.D.N.Y. 2018) (cleaned up). After the evidentiary hearing is conducted, pursuant to Federal Rules of Civil Procedure 52(a) and 65(d), the Court is required to set forth the findings of fact and conclusions of law which support its order. *Republic of Philippines v. New York Land Co.*, 852 F.2d 33, 37 (2d Cir. 1988). Based on the

Complaint, all exhibits attached thereto, the Application, the Declarations of Ms. Futterman and Mr. Iyer and all exhibits attached thereto, their Hearing testimony, and the exhibits received into evidence at the Hearing, the Court makes the following findings of fact.

Telebrands is a company that develops, produces, markets, and distributes various consumer products. Iyer Decl., ¶ 3. It is the original creator of several "As Seen on TV" products that Telebrands then promotes and sells throughout the United States and globally. *Id.* One of the most popular products in Plaintiff's offering is its line of Pocket Hose Products, which are sold under the trademark POCKET HOSE® and other related marks. *Id.*, ¶ 4. These Pocket Hose Products span a line of "innovative, patented, tear-resistant, kink-free" garden hoses that are pocket-sized in length. *Id.*, ¶ 5. When water flows through them, the hoses expand in size and then contract when the flow of water ceases. *Id.* Plaintiff makes and sells varieties and different lengths of the Pocket Hose Products, including the Copper Bullet, Silver Bullet, and Marine Pocket Hose Products. *Id.* The Pocket Hose Products typically retail for between $29.99-$109.99. *Id.*, ¶ 8.

Telebrands promotes and sells the Pocket Hose Products via television commercials on national cable channels, social media, and retail and wholesale outlets, such as Walmart and Home Depot. *Id.*, ¶ 7; Tr. 83:10-22. Some of these outlets also have locations in New York. Plaintiff also promotes and sells the Pocket Hose Products on its own website, its online storefront on Amazon, and its retail customers' websites. Iyer Decl., ¶ 7.

Plaintiff is the owner of all intellectual property rights in connection with the Pocket Hose Products. *Id.*, ¶ 9. It owns U.S. Patent No. 9,581,272 for "Expandable and Contractible Garden Hose" (the "Pocket Hose Patent" or "Patent"). *Id.*, ¶ 10; *see also id.*, Ex. A. According to the "Summary of the Invention," the Patent claims "a hose that expands longitudinally and automatically expands laterally upon the application of water pressure as controlled by a flow restrictor positioned along an outlet of the hose." *Id.*, Ex. A at 12.

At particular issue in this litigation is Claim 13 of the Pocket Hose Patent. *Id.* at 16-17. In the Patent, Claim 13 describes the invention as follows:

> A hose for water comprising: a flexible elongated outer tube having a first end and a second end, an interior of said outer tube being substantially hollow; a flexible elastic elongated inner tube having a first end and a second end, an interior of said inner tube being substantially hollow, said inner tube member is made from an elastic material having an elongation ratio between two and six times its contracted or unexpanded length; a female coupler secured to said first end of said inner and said outer tubes; a male coupler secured to said second end of said inner and said outer tubes; said inner and outer tubes being attached at the couplers; said female coupler coupling said hose to a source of pressurized water, said male coupler coupling said hose to a water flow restrictor; whereby, when water under pressure is introduced into the female coupler, said elongated inner tube expands longitudinally along a length of said inner tube and laterally across a width of said inner tube thereby increasing a length of said hose to an expanded condition; wherein the water flow restrictor is configured to vary the amount of restriction of the water under pressure that is released from the hose while maintaining the length of the hose in the expanded condition; and wherein removal of water under pressure allows the outer tube to contract from the expanded length whereby an inner surface of the outer tube catches on an outside surface of the elastic inner tube helping the outer tube to contract the inner tube.

*Id.*

Telebrands has marked [sic] its patented Pocket Hose Products since November 13, 2022. Iyer Decl., ¶ 16. Telebrands first learned of Defendants and

the accused products through its own investigation and Epstein Drangel's investigation as part of its efforts to protect its intellectual property rights and enforce its patents. *Id.,* ¶¶ 19-21. Plaintiff and Epstein Drangel attorneys visually inspected Defendants' Amazon listings to confirm that Defendants indeed offer for sale and, without authorization, sell products that appear to infringe the Patent (the "accused products"), including to customers located in New York. *Id.*, ¶ 22; Futterman Decl., ¶¶ 14, 16-17. These products are identified by the following ASIN numbers:  B0F48ZFQ5V and B0F393WX55 for Defendant Baopeng, and B0F2B93L7C for Defendant Xirssvy. *See* Futterman Decl., Ex. A. The accused products are offered for sale at a lower price than what Plaintiff offers on its Amazon storefront. Futterman Decl., ¶ 14. Defendants have never been authorized by Telebrands or any of its authorized sellers to offer for sale and/or sell products that are covered by the claims of the Pocket Hose Patent. Iyer Decl., ¶ 23.

Peter Quilla, a senior paralegal employed by Telebrands, purchased the accused products via each of Defendants' Amazon storefronts. Iyer Decl., ¶ 24; *id.*, Ex. B. The purchased products were shipped to Epstein Drangel's office address in New York. *Id.*, ¶ 24; *see also id.*, Ex. B; Futterman Decl., ¶¶ 18-19. Epstein Drangel attorneys opened the boxes of the purchased accused products and took out the items to physically inspect them. Tr. 58:16-21. After receiving and visually inspecting the test purchases, Epstein Drangel confirmed that the packaging and internal contents of each of the accused products were similar and that each accused product also contained the same packaging insert. Futterman Decl., ¶ 20;

*see also id.*, Ex. B.

The evidence adduced at the Hearing established that the accused product purchased from Defendants Baopeng matched each element of Claim 13 of the Patent, including that "the removal of water under pressure allows the outer tube to contract from the expanded length, whereby an inner surface of the outer tube catches on an outside surface of the elastic inner tube, helping the outer tube to contract the inner tube." Tr. 39:2-45:5. Specifically, at the Hearing Ms. Futterman conducted a physical demonstration of Defendant Baopeng's hose, both one that was whole and one that was deconstructed to show the inner workings of the hose (Hr'g. Pl. Exs. 3-4), and compared it to the Pocket Hose. Tr. 39:2-46:13. The accused products and the Pocket Hose products appear to be "interchangeable in that they are both expandable and contractible hoses that expand up to three times the original length upon the presence of pressurized water," which matches the claim in the Pocket Hose Patent. Futterman Decl., ¶ 23. Ms. Futterman walked through how the various components of the Baopeng hose satisfied each of the elements of Claim 13. Tr. 39:2-46:13.

The evidence at the Hearing established that the accused products purchased from Defendants Xirssvy and KDQ also met each element of Claim 13 of the Patent. Tr. 47:16-20; 48:16-49:17. The hoses purchased from Defendants Xirssvy, and KDQ (Hr'g. Pl. Exs. 5-8) were identical to the Baopeng hose, other than with respect to color. Tr. 46:5-47:8, 47:16-20, 48:16-49:17. Ms. Futterman confirmed that the answers she had provided during direct testimony regarding Defendant Baopeng's

products equally applied to the products purchased from Defendants Xirssvy and KDQ. Tr. 47:16-20; 49:14-17; *see also* Tr. 58:9-21; 72:16-73:2.

Prior to the commencement of this action, Plaintiff received a favorable decision from an Amazon APEX arbitration. Iyer Decl., ¶ 28. The independent arbitrator there ruled that various sellers of expandable hoses infringed Telebrands' Patent No. 10,174,870 ("'870 Patent"). *Id.* The '870 Patent includes similar claims to those of the Pocket Hose Patent for "a hose that automatically expands longitudinally and laterally upon the application of a pressurized liquid and automatically contracts to a contracted condition upon the release of the pressurized liquid." *Id.* It is an "earlier filed patent" and a "continuation patent" to the Pocket Hose Patent that is at issue in this case and has "nearly identical" claims as the Patent. Tr. 23:25-24:6. As a result of the favorable APEX decision, Amazon authorized Telebrands to remove additional expandable hoses that violated the '870 Patent from Amazon. Iyer Decl., ¶ 29. Since that decision was issued, Telebrands has removed over ten thousand infringing listings for expandable hoses from Amazon. *Id.*, ¶ 30.

Each Defendant in this action has had multiple Amazon Standard Identification Numbers ("ASINs") for expandable hoses removed from Amazon through the enforcement of the APEX arbitration decision. *Id.*, ¶ 31. An ASIN is a unique code issued by Amazon to identify products that are sold on its platform and functions similarly to a product barcode. *Id.* Each product sold on Amazon is assigned a specific ASIN number. *See* Tr. 20:20-23. KDQ, for example, has had

over twenty-four distinct ASINs for expandable hoses that infringe Plaintiff's patents, which were all removed from Amazon between November 15, 2024, and May 10, 2025.  Iyer Decl., ¶32; *see also id.*, Ex. C.  Plaintiff has removed 62 garden hose products that infringe the patent from Defendant Xirssvy.  Tr. 20:24-21:5.

## CONCLUSIONS OF LAW

Injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007) (per curiam) (cleaned up).  In considering an application for preliminary injunction, the Court must evaluate the plaintiff's showing for "(1) a likelihood of success on the merits," (2) "that [the plaintiff] is likely to suffer irreparable injury in the absence of an injunction," (3) that "the balance of hardships tips in the plaintiff's favor," and (4) "that the public interest would not be disserved by the issuance of [the] injunction." *Salinger v. Colting*, 607 F.3d 68, 79–80 (2d Cir. 2010) (quotation marks and citations omitted).

### A. Likelihood of Success on the Merits

"To establish a likelihood of success on the merits, a plaintiff need not show that success is an absolute certainty.  It need only make a showing that the probability of . . . prevailing is better than fifty percent." *fuboTV Inc. v. Walt Disney Co.*, 745 F. Supp. 3d 109, 133 (S.D.N.Y. 2024) (cleaned up).  For a utility patent, the "patentee must show that [(1)] it will likely prove infringement of the asserted claims and that [(2)] its infringement claim will likely withstand the alleged

infringer's challenges to patent validity and enforceability." *Metalcraft of Mayville, Inc. v. The Toro Co.*, 848 F.3d 1358, 1364 (Fed. Cir. 2017) (citations omitted).  The Court should not grant a preliminary injunction where the accused infringer "raises a substantial question" concerning either of these two prongs.  *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350-51 (Fed. Cir. 2001).

To determine if there has been infringement, the Court examines whether the accused product "embodies each claim element or its equivalent." *Jeneric/Pentron, Inc. v. Dillon Co.*, 205 F.3d 1377, 1380 (Fed. Cir. 2000).  Plaintiff contends that the accused products embody each element of Claim 13 of the Patent. At the preliminary injunction stage, expert testimony is not required to prove infringement.  *See BlephEx, LLC v. Myco Indus., Inc.*, 24 F.4th 1391, 1403-04 (Fed. Cir. 2022).  This is particularly true where the patent involves simple technologies. *Id*.

Although Ms. Futterman was not proffered as an expert witness by Plaintiff, she testified that she was familiar with the technology of the Pocket Hose Patent and expandable hoses in general, and that she understood the language of Claim 13.  Tr. 33:11-34:19.  Additionally, Ms. Futterman demonstrated during the Hearing how the accused products purchased from Defendants' Amazon storefronts embodied each of the elements of Claim 13, while Defendants failed to submit any evidence to rebut this showing.  The Court therefore finds the evidence is sufficient to establish that Plaintiff is likely to succeed in proving infringement of Claim 13 of the Pocket Hose Patent.

Defendant KDQ argues in its brief opposing Plaintiff's motion for a Preliminary Injunction that Plaintiff has failed to conduct a product-by-product analysis of infringement of Claim 13.  KDQ Opp'n Br. at 9 (citing *ABC Corp. I v. P'ships & Unincorporated Ass'ns Identified on Schedule "A"*, 52 F.4th 934, 944 (Fed. Cir. 2022)).  At the Hearing, however, Plaintiff's witnesses confirmed that the accused products purchased from Defendants Baopeng, Xirssvy, and KDQ were identical other than with respect to color, and that each embodied all of the elements of Claim 13.  This evidence was sufficient to establish that each of the accused products likely infringed the Patent.

In terms of the second prong of the infringement test, a patent is statutorily presumed to be *prima facie* valid.  35 U.S.C. § 282(a).  The burden is thus on the accused infringer to challenge the patent's validity.  *See Lear Siegler, Inc. v. Aeroquip Corp.*, 733 F.2d 881, 885 (Fed. Cir. 1984).  Defendants have failed to raise any arguments regarding validity.

Accordingly, the Court finds that Plaintiff is likely to succeed on the merits of its patent infringement claim.

## B. Irreparable Harm

The establishment of irreparable harm is the "single most important prerequisite for the issuance of a preliminary injunction."  *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quotation marks and citations omitted).  "To satisfy the irreparable harm requirement, [p]laintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is

neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id.* (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)). Although the "mere possibility of irreparable harm is insufficient," *Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 934 F.2d 30, 34 (2d Cir. 1991), Plaintiffs need only show that there is a "threat of irreparable harm, not that irreparable harm already [has] occurred," *Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010) (emphasis removed).

Upon the finding of patent infringement, irreparable harm is not automatically assumed. *Apple Inc. v. Samsung Electrs. Co.*, 735 F.3d 1352, 1359 (Fed. Cir. 2013) (citing *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1148 (Fed. Cir. 2011)). Furthermore, "to satisfy the irreparable harm factor in a patent infringement suit, a patentee must establish both of the following requirements: 1) that absent an injunction, it will suffer irreparable harm, and 2) that a sufficiently strong causal nexus relates the alleged harm to the alleged infringement." *Apple Inc. v. Samsung Electrs. Co.*, 695 F.3d 1370, 1374 (Fed. Cir. 2012).

Plaintiff alleges that, absent a preliminary injunction, it will suffer irreparable harm based on purported lost profits, loss of business opportunities, loss of future sales and market share, price erosion, loss of reputation and goodwill, and damage to brand confidence. *See* ECF No. 32 at 12-14. Telebrands argues that the infringing activities of Defendants weakens Telebrands' "ability to control the nature and quality of the Infringing Products, thereby weakening Telebrands'

brand recognition and reputation." *Id.* at 14.  Furthermore, the potential inferior quality of the Infringing Products could lead to "increased skepticism in consumers presented with genuine Pocket Hose Products undermining Telebrands' reputation and goodwill." *Id.*  Lastly, the sale of the accused products on Amazon and other e-commerce platforms directly competes with the sale of genuine Pocket Hose Products sold by Telebrands and other authorized sellers.  *Id.*

Defendant KDQ argues that Plaintiff has failed to provide specific evidence to support its allegations of potential lost sales or diminishment of market share. KDQ Opp'n Br. at 15-16.  KDQ also asserts that price erosion cannot qualify as irreparable harm because it is compensable by money damages.  *Id.* at 16-17.  But the Federal Circuit has clearly articulated that "[p]rice erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm." *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) (citations omitted).  Moreover, "the mere possibility of future monetary damages does not defeat a motion for preliminary injunction." *Id.*

Mr. Iyer's declaration, which he adopted as his direct testimony at the Hearing, Tr. 74:5-20, states that "Defendants' intentional and willful infringement has resulted in lost profits to Telebrands and has damaged Telebrands' reputation as an innovator, thereby negatively affecting Telebrands' relationships with current and potential customers (including both retail customers and end consumers) and eroding Telebrands' market share by copying the Pocket Hose Products and making, using, offering for sale, selling or importing goods that infringe the Pocket Hose

Patent," Iyer Decl., ¶ 25. Mr. Iyer further testified that the Pocket Hose Patent was "the number one selling expandable hose" and that it was a disruptor in the watering industry. Tr. 84:23-85:4. He noted that, to evaluate its market share, Plaintiff monitors industry ranking reports, such as AC Nielsen. *Id.* ("[W]e have a substantial market share where consumers have shifted away from buying unwieldy regular garden hoses, rubber hoses, and have gone to the convenience of our product, not the infringing product."). The Court therefore finds that, based on the evidence in the record, Plaintiff has made a prima facie showing of threatened market share and damage to reputation and goodwill. *See Bosch LLC*, 659 F.3d at 1154 (holding that plaintiff did not need to provide direct evidence to make prima facie showing of lost market share). This is sufficient to find for the first element that, absent an injunction, Plaintiff will suffer irreparable harm.

Regarding the second requirement of a sufficiently strong causal nexus, KDQ contends that Plaintiff has failed to provide any "customer surveys, market evidence, or admissions from [Defendants] regarding the relationship of [infringing features covered by the asserted patent] to customer demand." KDQ Opp'n Br. at 19 (quoting *Finjan, Inc. v. Blue Coat Sys., LLC*, No. 15-cv-03295-BLF, 2016 U.S. Dist. LEXIS 162881, at *24-25 (N.D. Cal. Nov. 22, 2016)). But "[d]irect competition in the same market" is enough to "suggest[] strongly the potential for irreparable harm without enforcement of the right to exclude." *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1363 (Fed. Cir. 2012).

Here, Plaintiff has sufficiently proven the direct competition it faces from the

accused products sold by Defendants.  Mr. Iyer's declaration establishes that Plaintiff has expended time and resources to remove infringing listings for expandable hoses on Amazon since the favorable APEX arbitration result, thereby showing that other companies' products that infringe Plaintiff's patents have a discernible competitive impact on Plaintiff.   Iyer Decl., ¶¶ 28-32.  Further, in an affidavit submitted in support of Defendant Xirssvy's opposition to Plaintiff's Motion for a Preliminary Injunction, Huayin Yao, a manager at Xirssvy, testified that Xirssvy indeed sold approximately 8,195 units of the accused product and its variations.  Yao Decl., ¶ 9.  Yao also acknowledged that "Xirssvy no longer sells the [accused products]" and that "Xirssvy does not plan to sell them in the future."  *Id.*, ¶ 14.

Based on this evidence in the record, the Court concludes that Plaintiff has shown that there is a sufficiently strong causal nexus of the alleged harm to the alleged infringement.  Accordingly, the Court finds that Plaintiff has satisfactorily shown that, absent a preliminary injunction, it will suffer irreparable injury.

## C. Balance of Equities and Public Interest

"In determining whether the balance of the equities tips in the plaintiff's favor and whether granting the preliminary injunction would be in the public interest, the Court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief, as well as the public consequences in employing the extraordinary remedy of injunction."  *Bionpharma Inc. v. CoreRx, Inc.*, 582 F. Supp. 3d 167, 178 (S.D.N.Y.

2022) (cleaned up).

Absent an injunction, Plaintiff will continue to suffer reputational harm and impact to its market share, as outlined above.  Further, "the public interest nearly always weighs in favor of protecting property rights in the absence of countervailing factors, especially when the patentee practices his inventions." *Apple Inc. v. Samsung Electrs. Co..*, 809 F.3d 633, 647 (Fed. Cir. 2015).  The benefit to the public in protecting patent rights stems from "not only [] the Patent Act's statutory right to exclude, which derives from the Constitution, but also [] the importance of the patent system in encouraging innovation." *Id.*  Here, the public interest would be best served by protecting patent rights and entering the injunction to prevent Defendants from manufacturing, promoting, and selling products that infringe Plaintiff's Pocket Hose Patent.

Because Plaintiff has demonstrated its likelihood of success on the merits of its patent infringement claim, an irreparable injury, that the balance of the hardships favors them, and that the public interest would not be disserved, the Court grants Plaintiff's Motion for a Preliminary Injunction.

### D. Scope of the Injunction

Plaintiff's proposed preliminary injunction contains a provision restricting the transfer of any of the funds in Defendants' accounts.  Defendants oppose this aspect of the preliminary injunction motion, and also move for dissolution of the asset freeze provisions of the TRO, arguing that this Court lacked the authority to

enjoin the transfer of their assets in a patent action.  The Court agrees that the *ex parte* TRO's asset freeze provisions exceeded the Court's authority.

A district court's authority to order the pre-judgment restraint of assets largely depends upon the nature of the remedy sought by Plaintiff and the purpose of the restraint.  In *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, the Supreme Court made clear that the district court "had no authority [under Rule 65] to issue a preliminary injunction preventing [defendants] from disposing of their assets pending adjudication of [plaintiffs'] contract claim for money damages."  527 U.S. 308, 333 (1999).  In *Gucci Am., Inc. v. Weixing Li*, the Second Circuit was confronted with the question of whether *Grupo Mexicano* prohibited district courts from preliminarily enjoining the transfer of assets in other prejudgment contexts.  768 F.3d 122, 126 (2d Cir. 2014).  The Second Circuit read *Grupo Mexicano* to prohibit district courts from freezing assets "pursuant to Rule 65 where such relief was not traditionally accorded by courts of equity."  *Id.* at 131 (cleaned up).  But, the Second Circuit continued, district courts "maintain the equitable power to do so where such relief was traditionally available where the plaintiff is pursuing a claim for final equitable relief, and the preliminary injunction is ancillary to the final relief."  *Id.* (cleaned up).  Applying that test, the Second Circuit held that district courts could enjoin the transfer of assets in an action seeking the equitable remedy of an accounting of profits for violations of the Lanham Act.  *Id.* at 131-32.  In reaching this conclusion, the *Gucci* Court surveyed the origins of "accounting" as a "restitutionary action in equity, imposing on a defendant the obligation to disclose

and return profits from the use of the plaintiff's property." *Id.* at 131.  And in trademark actions, profits are "allowed as an equitable measure of compensation." *Id.* (quoting *Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.*, 240 U.S. 251, 259 (1916)).

In its Application for a TRO, Plaintiff argued that they were seeking the "equitable accounting of Defendants' profits from the sales of Infringing Products." Pl. Br. at 15.  Plaintiff cited cases in which courts "found it necessary and appropriate to restrain defendants' assets in the context of design infringement cases. *Id.* at 16.  Yet this is a utility patent case.  And as Plaintiff has now been forced to concede, Pl. Reply Br. at 3, profits are unavailable as a remedy in a utility patent case.  *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 505 (1964) (holding that Congress amended the statute "to eliminate the recovery of profits as such and allow recovery of damages only").  The statutory provision that governs damages in utility patent cases, 35 U.S.C. § 284, allows only for an award of "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court."

Plaintiff argues in the alternative that an award of "reasonable royalties" under section 284 is an equitable remedy.  Pl. Reply Br. at 2-3.   But compensatory damages are the classic form of legal relief.  *Pereira v. Farace*, 413 F.3d 330, 339 (2d Cir. 2005).  Reasonable royalties as a measure of compensatory damages have not been traditionally awarded by courts of equity.  As a legal remedy, they are

18

determined by a jury.  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 377 (1996) ("Equally familiar is the descent of today's patent infringement action from the infringement actions tried at law in the 18th century, and there is no dispute that infringement cases today must be tried to a jury, as their predecessors were more than two centuries ago.").

This is consistent with the proposition that, although not all awards of monetary relief are legal in nature, "an action for money damages was 'the traditional form of relief offered in the courts of law.'"  *Chauffeurs, Teamsters & Helpers, Loc. No. 391 v. Terry*, 494 U.S. 558, 570 (1990) (citation omitted).  Courts will "find an exception to the general rule and characterize damages as equitable" where such damages are properly characterized as restitution, "such as in actions for disgorgement of improper profits," *id.* (cleaned up), or where the award is "incidental to or intertwined with injunctive relief," *id.* at 571.  Yet section 284, which provides for monetary "damages" to "compensate" the patent holder for its losses, cannot be characterized as restitutionary.  *See, e.g.*, *Pereira*, 413 F.3d at 340 ("[F]or restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property *in the defendant's possession*.") (quotations and citation omitted).

Plaintiff cites Federal Circuit caselaw for the proposition that an award of "ongoing royalties" for patent infringement is an equitable remedy.  Pl. Reply Br. at 2-3.  This caselaw is inapposite.  The Federal Circuit has affirmed that courts may, in appropriate circumstances, issue an order allowing prospective use of a patented

invention in exchange for payment to the patent holder of an on-going royalty. *See Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1314 (Fed. Cir. 2007) ("Under some circumstances, awarding an ongoing royalty for patent infringement in lieu of an injunction may be appropriate."). The Federal Circuit explained that this power derives from 35 U.S.C. § 283, which authorizes courts to issue "injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." *Id.* Accordingly, the on-going royalty available under section 283 is an inherently equitable remedy, akin to a compulsory license. *Id.* at 1313 n.13. Unlike compensatory damages awarded under section 284, which are determined by a jury, there is no right to a jury trial to determine the appropriate amount of on-going royalties. *Id.* at 1315-16; *see also Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1378 (Fed. Cir. 2017) (observing that term "damages" does "not include ongoing royalties and other forms of equitable relief"). On-going royalties permitted under section 283 are therefore distinct from the reasonable royalties awarded as compensatory damages under section 284.

In its supplemental brief, Plaintiff does not press the argument regarding the availability of an asset freeze under Rule 65. Instead, they argue that the Court has the authority to issue an order to attach the Defendants' assets under New York law. "Prejudgment attachment is a provisional remedy to secure a debt by preliminary levy upon the property of the debtor in order to conserve that property for eventual execution." *DLJ Mortg. Cap., Inc. v. Kontogiannis*, 594 F. Supp. 2d

308, 318 (E.D.N.Y. 2009). Rule 64 permits federal litigants to seek an order of attachment to secure satisfaction of a potential judgment in accordance with the laws of the state in which the district court sits. New York law permits prejudgment attachment when certain procedural and substantive requirements have been met. NY CPLR §§ 6201, 6212.

"Because attachment is a harsh remedy, [however], courts have strictly construed the statute in favor of those against whom it may be employed." *Kornblum v. Kornblum*, 34 A.D.3d 748, 749 (N.Y. 2d Dep't 2006). In the instant case, Plaintiff has not even filed a motion for attachment pursuant to section 6212 of the CPLR, let alone submitted affidavits or other evidence satisfying the procedural and statutory requirements for attachment. In the absence of a properly-supported motion, the Court cannot order the attachment of Defendants' accounts under the auspices of Rule 64 and CPLR 6201.

## CONCLUSION

Plaintiff's motion for a preliminary injunction is GRANTED IN PART AND DENIED IN PART. The TRO that was entered on May 1, 2025, is hereby vacated and dissolved. Plaintiff shall serve this Order on Defendants' Service Providers and Financial Institutions within 24 hours of the date of this Order, and file proof of service within two days of accomplishing service.

SO ORDERED.

Dated:  June 5, 2025
       New York, New York

_____
JEANNETTE A. VARGAS
United States District Judge